

**SO ORDERED.**

**SIGNED this 10 day of October, 2012.**

_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:                                                                             CASE NO.

RYAN M. CHRISTIANS,                                                 12-00819-8-SWH

       DEBTOR

## ORDER ALLOWING MOTION TO DISMISS
## IF DEBTOR FAILS TO CONVERT CASE

The matter before the court is the bankruptcy administrator's motion to dismiss this case for abuse pursuant to 11 U.S.C. § 707(b)(3). A hearing took place in Raleigh, North Carolina, on August 21, 2012. For the reasons that follow, the case will be dismissed unless the debtor converts the case to one under chapter 13 within ten days of the date of this order.

### BACKGROUND

Ryan M. Christians filed a petition for relief under chapter 7 of the Bankruptcy Code on February 1, 2012. The bankruptcy administrator filed a notice of presumed abuse under 11 U.S.C. § 707(b) on March 27, 2012, and requested a Rule 2004 examination of the debtor. As a result of the 2004 examination and a review of the documentation provided, the bankruptcy administrator determined that the case was not an abuse under 11 U.S.C. § 707(b)(2)(a) . However, the bankruptcy administrator later resumed her inquiry and, on May 14, 2012, filed a motion to dismiss

pursuant to 11 U.S.C. § 707(b)(3). The debtor filed a response in opposition to the motion on June 11, 2012.

The debtor's original Schedule I states that Mr. Christians is separated from his wife and has no dependents. He is an accountant with Petway Mills & Pearson, PA and earns $6,250 per month in gross wages. After payroll deductions for taxes and insurance (including a $500 payment towards his estranged wife's health insurance), the debtor's monthly net wages are listed as $4,386.42. In his testimony, debtor indicated that this number fluctuates monthly due to the number of hours he works, with more income earned during the company's busy season and less income during its slower months. He also earns $1,395 a month from rental of his single-family home in Indiana. His total average net monthly income is $5,781.42.

The debtor's original Schedule J listed $650 per month for utilities, including cell phone, internet, electricity, water, and satellite television expenses. The schedule also includes a $1,200 allotment for rent, $400 for food, $250 for transportation, $200 for entertainment and recreation, $250 for various insurance payments, $499 for car loan payment, $325 for student loan payments, and $175 for miscellaneous expenses including cigarettes, pets, haircut and garbage collection. Schedule J also listed $1,550 for payment of the rental house mortgage. Based on these figures, debtor showed a net monthly income of $67.42.

In the motion to dismiss, the bankruptcy administrator contends that the debtor has the ability to pay a sizable dividend to creditors and that the totality of the debtor's financial circumstances demonstrates abuse. The bankruptcy administrator objected to the $1,200 allocation for rent because the IRS standard for rent for a single individual in Wake County is $1,104 and because she believes the debtor could find reasonable accommodations at a rate within the standard amount. The

bankruptcy administrator also objected to the specific expenses of $100 for cigarettes, $135 for satellite television, and $120 for a cell phone in addition to the $200 allocation for recreational expenses. The bankruptcy administrator contends that the debtor's student loan payment obligation should not be deducted to derive disposable income because it is for an unsecured debt which does not receive priority status under § 507 of the Bankruptcy Code. Thus, she argues, the $325 payment should be available for ratable distribution among all unsecured creditors. Finally, the bankruptcy administrator notes that shortly after filing, the $613.58 insurance deduction on the debtor's Schedule I dropped to $108.42 per month after the debtor ceased paying $505.16 towards his estranged wife's monthly health insurance cost. That money, she argues, should now be available for creditor payments. In debtor's response, he acknowledged that the health insurance expense had decreased and that the student loan repayment was a legitimate issue, but denied the other allegations.

At the hearing, the debtor provided testimony regarding the events that led up to the filing of his chapter 7 petition. In the summer of 2010, the debtor's wife found a new job in Fayetteville, North Carolina. The debtor agreed to move with her from Indiana to North Carolina, and found a position in Cary, North Carolina, at the firm with which he is still employed. On September 15, 2010, they purchased a home together in Fuquay Varina, North Carolina. They could not qualify for traditional financing, but obtained owner financing in the amount of $316,500, secured by a purchase money deed of trust.

The debtor has attempted to sell his Indiana home by placing it on the market with a realtor. During the nine months it was listed, he received two offers, neither of which were acceptable. The debtor believes the house is worth $265,000 and states that the outstanding mortgage is $225,000.

The debtor began renting the property in June of 2011 for $1,550 a month with $155 paid as a fee to the property manager and a net of $1,395 to him. The debtor testified that the rent was recently decreased to $1,500 a month resulting in a current net of $1,350 to the debtor. The monthly mortgage obligation on the Indiana property is $1,550. The debtor testified further that although he incurs a loss each month, his hope all along has been that the economy would stabilize and that he would eventually be able to sell the home without forfeiting the equity in it.

In addition to the debt on the two properties, the debtor amassed over $60,000 in student loans for his undergraduate and graduate education. He also accumulated approximately $75,000 in credit card debt as of the date of the petition. The debtor testified that $20,000 of that debt accrued prior to graduate school, and that the remaining balance is the result of his reduced employment while he was in school and the failure of his wife to abide by a reasonable monthly budget.

In September 2011, the debtor learned that his wife was having an adulterous affair. A month later, she resigned from her job, receiving a small severance package, and in December 2011, she moved out of the marital home. The debtor testified that she stopped contributing to their ongoing expenses, including credit card bills and the expenses associated with the Indiana property. The debtor ceased paying his mortgage and property tax payments on the North Carolina home at that point.

Overall, in this chapter 7 case, the debtor proposes to retain his assets, surrender his North Carolina home, and make no payments to any unsecured creditors. The debtor has claimed all of his property (other than the North Carolina home) as exempt, and the chapter 7 trustee has filed a report of no distribution.

**DISCUSSION**

The bankruptcy administrator brought this motion under 11 U.S.C. § 707(b)(3). Section 707(b)(1) grants the court authority to dismiss a chapter 7 case if it finds that the granting of relief would be an abuse of the provisions of the chapter. Section 707(b)(3) provides guidance to the court in its determination of whether an abuse exists under § 707(b)(1) by requiring the court to consider "whether the debtor filed the petition in bad faith; or [whether] the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3). This test is applicable regardless of whether there is a presumption of abuse as determined by the means test in § 707(b)(2). See Calhoun v. U.S. Trustee, 650 F.3d 338, 340-41 (4th Cir. 2011). The moving party, in this case the bankruptcy administrator, has the burden of proving abuse pursuant to 11 U.S.C. § 707. In re Lipford, 397 B.R. 320, 326 (Bankr. M.D.N.C. 2008); In re Leggett, 2011 WL 802806 *3 (Bankr. E.D.N.C. 2011). The bankruptcy administrator does not contend that the petition was filed in bad faith and thus did not proceed pursuant to 11 U.S.C. § 707(b)(3)(A); instead, the bankruptcy administrator analyzed the totality of the circumstances under 11 U.S.C. § 707(b)(3)(B), and assessed bad faith as a basis for dismissal only to the extent that it may be demonstrated by the totality of the circumstances.

In this circuit, courts evaluate motions to dismiss under § 707(b) using the "totality of the circumstances" factors set forth in Green v. Staples, 934 F.2d 568 (4th Cir. 1991). In Green, the court rejected the notion that a case could be dismissed based solely on a debtor's ability to pay its creditors, because "nowhere in the Code is there a requirement that a debtor be insolvent in order to file for bankruptcy." 934 F.2d at 572. Instead, the court held that in addition to looking at a debtor's ability to pay his creditors, which the court noted is recognized as a "*primary* factor to be

considered" by most courts to address the question, there are five factors in particular that can guide a court's evaluation of whether a filing is abusive, based on the totality of circumstances:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
>
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
>
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
>
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
>
> (5) Whether the petition was filed in good faith.

Id. The Green court noted that "[e]xploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors." Id.

The Green case was decided prior to passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), 119 Stat. 23. While BAPCPA did amend the § 707(b)(3) language, the Fourth Circuit subsequently acknowledged the continuing relevance of the Green factors, which remain an instructive guideline for analyzing the totality of the circumstances under a § 707(b)(3) motion for abuse. Calhoun, 650 F.3d at 342. The Calhoun court declined to "make a determination as to the enduring applicability of the holding in Green," yet it accepted the bankruptcy court's analysis, which had characterized the Green factors as "instructive." Id. at 342. "The bankruptcy court found a multitude of factors weighing in favor of abuse," the Calhoun court wrote, "and we discern no error in those findings." Id.; see Bankruptcy Adm'r v.

Gregory, 471 B.R. 823, 829 (Bankr. E.D.N.C. 2012) (noting the language in Calhoun and concluding that "[i]n light of that language, this Court views the Green factors as instructive guidance in evaluating the totality of [the debtor's] financial circumstances"). With these parameters in mind, this court also will track the Green factors in assessing the totality of the circumstances in this case, as follows:

*1. Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment:* The bankruptcy administrator points out that there must be a relationship between the illness, calamity, disability, or unemployment and the filing of the petition, In re Cemal, 396 B.R. 649, 662 (Bankr. E.D. Va. 2004), and argues that this factor is not satisfied here because the term "calamity" was not intended to encompass events such as divorce. While the Fourth Circuit has not elaborated on whether a divorce qualifies as a calamity, Green suggests that if *income disruption* is the cause of the debtor's financial distress, the factors that brought about the disruption should be considered. Id.; see Green, 934 F.2d at 572-73. As the Cemal court observed,

> All of the events enumerated by the Court of Appeals [in Green] share a common factor: income disruption. Green suggests that if income disruption is the cause of the debtor's financial distress the causes of the disruption should be considered. If they are beyond the control of the debtor, they weigh against finding substantial abuse. If they are caused by the debtor's voluntary conduct, they weigh in favor of substantial abuse. Separation or divorce may weigh against finding substantial abuse. Voluntary unemployment or underemployment may weigh in favor of finding substantial abuse.

Cemal, 396 B.R. at 662.

And, while "a sudden calamity need not immediately precede the filing of a petition in bankruptcy," it should "be closely related to the circumstances giving rise to the filing of the petition." Cemal, 396 B.R. at 663. The debtor and his wife lived together for ten years. This

prolonged period of relative stability ended in a sudden sequence of challenging events, the debtor argues: the move to North Carolina to follow his wife's job opportunity, the collapse of his marriage, his wife's resignation from her job, and then her subsequent departure, leaving him solely responsible for all major indebtedness.

It appears that the debtor moved to North Carolina in the summer of 2010 and filed his petition in February of 2012, which is a span of no more than eighteen months. The debtor testified that he sought legal advice on bankruptcy in October 2011, approximately four months prior to filing. Up until December 2011, according to the debtor's credit report, which was admitted as the debtor's Exhibit A, all of his debts were paid current until these events transpired. While the court acknowledges the bankruptcy administrator's perspective that many people experience divorce and that it is not, generally speaking, the type of calamity envisioned in this <u>Green</u> factor, the court believes that the suddenness and sequence of all of these events was, for the debtor, equivalent to a sudden calamity, and that the events were closely related to the petition filing. This factor supports denial of the motion.

*2. Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay:* In January of 2012, debtor purchased a new 2012 Hyundai Elantra, just prior to filing his chapter 7 petition. At that point in time, the debtor knew that the situation with his wife was unlikely to be reconciled, that he would be living alone on one income, and that his debts were substantial. As a result of the purchase of his new car, he incurred a monthly $499 car payment in addition to monthly car insurance payments of $125. The debtor contends that he needed a reliable means of transportation to commute to and from his job. While the court agrees that the debtor is entitled to reliable transportation, there were, and are, many viable options available to the debtor

that didn't require the purchase of a brand-new $26,000 car, with a concomitant monthly obligation of $624. The debtor offered no evidence that he was unable to secure a less expensive vehicle while still maintaining the attributes of fuel efficiency and reliability. This is unlike the situation in In re Coyle, 2011 WL 5902739 *4 (Bankr. E.D.N.C. 2011), where the court found that the purchase was not "made on the eve of bankruptcy" and that the debtor probably could have afforded his car at the time he purchased it. The purchase in this case, however, *was* on the eve of bankruptcy. The debtor had already consulted with a bankruptcy attorney, knew his financial situation was precarious, and filed his petition less than one month after the car purchase. This purchase seems excessive in light of the financial situation the debtor faced at that point in time. Application of the second factor supports a finding of abuse.

  *3. Whether the debtor's proposed family budget is excessive or unreasonable:* The bankruptcy administrator identified several of the debtor's listed expenditures as being too high: the rental cost of $1,200; $135 for satellite services; $100 for cigarettes; and $120 for a cell phone (in addition to the $200 allotment for recreation and entertainment expenses). The two areas of utilities and entertainment and recreation appear to present the debtor with some opportunity to cut costs and the bankruptcy administrator projects that with some belt-tightening, the debtor would have discretionary income sufficient to allow a meaningful distribution to creditors. The court agrees.

The standard mortgage/rent payment in Wake County, North Carolina, for a family of one is $1,104.[1] This amount includes the cost of any first mortgage or rent, second mortgage, real property taxes, and homeowners or renters insurance on the property. The standard for all other non-mortgage expenses (including maintenance, repairs, gas, electric, water, heating oil, garbage collection, residential telephone service, cell phone service, cable television, and internet service) is $409. According to debtor's original Schedule J, debtor estimates $1,290 for rent and insurance, and $685 for total utilities as defined by the standard. (The $685 total is calculated by adding together the $300 for electric, $40 for water, $310 for phones/internet/cable, $20 for home maintenance repairs and $15 for garbage collection). Debtor's total expenditures equal $1,975, which is $462 over the standard for the county in which he lives. For a family of one, this is clearly an excessive budget and well beyond the standard for this county. A nominal amount of belt-tightening with the electric, cell phone, and satellite television expenses could easily bring the debtor within the $1,513 figure, allow for a comfortable standard of living, and still provide some cash for creditors.

Debtor's counsel argued that another reason behind the debtor's increasing recreational expenses is the debtor's legitimate interest in meeting people, finding opportunities for companionship, maintaining physical fitness and appearances, and possibly encouraging future business opportunities. The bankruptcy administrator's Exhibit BA-2 identified a one-time $900 charge to a social networking program followed by a $100 monthly membership fee, totaling an average monthly fee of $175. In addition, debtor has one gym membership for $40 per month and

---

[1] According to the United States Department of Justice U.S. Trustee Program, their website lists the allowable living expenses for an individual who has filed for bankruptcy. This website lists the local housing and utilities standards calculated by geographic location and numbers of people in the household. See www.justice.gov/ust/eo/bapcpa/20111101/bci_data/housing_charts/irs_housing_charts_NC.htm.

10

a second gym membership for $125 per month. Notwithstanding a multitude of other smaller monthly recreational expenses, these three recreational expenditures alone total $340 a month, which is 70% over the initial $200 budget. The court is certainly sympathetic to the debtor's circumstances, but the expenses must be reasonable and not excessive and must be evaluated against the debtor's obligation to provide for the distribution of net income to creditors, where available. The debtor's actual recreational expenses are not reasonable and are, in fact, in excess of what was listed on his Schedule J.

In addition, as the information provided in the bankruptcy administrator's Exhibit 2 indicates, the debtor is actually spending more than he lists on his Schedule J in other areas. The debtor explains that he spent more money recently because he used funds freed up from not paying his mortgage or property taxes or his wife's health insurance premium over the past several months to make several one-time purchases to replenish his household and lifestyle due to the unexpected split from his estranged wife. For example, the debtor testified that he spent several hundred dollars refinishing an antique bedroom set for his personal use. Going forward, some of those funds will need to be used towards the rental payment debtor will incur at his new residence, but at a minimum, the extra $505.16 that became available when he stopped making his wife's health insurance payments in March of 2012 should be available for the payment of creditors. The court finds that for the reasons above, the debtor's proposed budget is excessive, which supports dismissal.

*4. Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition:* While some inaccuracies on a debtor's schedules may be forgiven, a pattern of inaccuracies tends to show abuse. See Lipford, 397 B.R. at 332-38. The bankruptcy administrator claims that there are major discrepancies between the amounts set out

in the petition and the amounts actually spent by the debtor. One obvious change from debtor's Schedule I is the $505.16 difference resulting from the insurance payment that the debtor no longer pays toward health insurance for his estranged wife. The court notes that the debtor disclosed, at the bottom of his original Schedule I, that the payment of his wife's insurance would cease once she obtained her own policy.

The evidence illustrates some examples of differences between the debtor's schedules and actual expenses during the case. The debtor listed $300 as an expense for electricity. However, the actual average for the debtor's electricity expenses over the past six months was approximately $115. Debtor listed $400 as a monthly expense for food, but the actual monthly average for the debtor's food expenses over the past six months was approximately $613. In addition, as discussed above, the $200 listed for recreation and entertainment expenses and the $175 listed for "Other Expenditures" are well below the actual amount the debtor spends out of his monthly budget.

Upon the request of the court, the debtor presented, post-hearing, revised Schedules I and J. The revised Schedule J was fairly similar to the original Schedule J, with the addition of some food expenses and other expenditures that bring his total average monthly expenses to a little more than $200 over the amount he initially claimed. However, without any noted change in income or further rationale shared with the court, the debtor's revised Schedule I reflected a $415.63 increase in the amount of payroll taxes deducted. As this revision – a major one – was offered with no explanation to the court, the court must base its analysis on the originally filed Schedules.

In light of the fact that debtor no longer spends $505.16 per month for his wife's health insurance policy, it appears that if debtor were to actually spend *within* the amounts listed on Schedule J, a sizeable dividend *would* be available to pay towards unsecured creditors. As the

Supreme Court held in Hamilton v. Lanning,130 S. Ct. 2464, 2478 (2010), a bankruptcy court "may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation [of a debtor's chapter 13 plan]." In this instance, it is "known or virtually certain" that debtor no longer has that $505.16 monthly obligation, so it is available for this court's consideration when projecting debtor's disposable income of what would be available to creditors. Id. at 2473-74. While it may be that the original schedules were representative of debtor's financial condition when they were filed, they no longer reflect his true actual financial position. The fact that the original schedules are no longer correct is particularly relevant to evaluating the debtor's ability to pay, which remains a significant consideration in the totality of the circumstances analysis and is discussed in more detail below. This factor supports a finding of abuse.

*5. Whether the petition was filed in good faith:* The bankruptcy administrator contends that the petition was filed in bad faith because the debtor did not attempt to list the North Carolina property for sale and is using the bankruptcy process to surrender a home in which he has no equity. There is a compelling argument to be made for abuse, she insists, given that the debtor's chapter 7 petition lists as exempt the Indiana property in which he does have some equity, surrenders the North Carolina property in which he has no equity, and attempts to discharge $70,000 worth of credit card debt. The court disagrees. According to the debtor's testimony, a realtor consulted with in the Fall of 2011 believed that the North Carolina property might be able to be sold for approximately what he bought it for, but the debtor would have been obliged to pay closing and other costs out of pocket. There is no requirement that a debtor must attempt to sell a property to prove good faith in filing. From the record, it appears that the petition was filed in good faith.

13

Finally, separately from and in addition to the five Green factors, the court considers the debtor's ability to pay, which is a "heavily-weighted" consideration in the § 707(b)(3) context. "The ability to repay creditors is generally evaluated by the amount a debtor would be able to commit to a hypothetical Chapter 13 plan." In re Sonntag, 2012 WL 1065482 *4 (Bankr. N.D.W. Va. 2012) (quoted in In re Bogart, 2012 WL 3913093 (Bankr. E.D. Va. 2012)). In Lipford, the court noted that "[a]lthough a number of courts have considered the percentage of total indebtedness that could be repaid through a hypothetical Chapter 13 plan, there is no bright line test." Lipford, 397 B.R. at 328 & n.4 (citing In re Behlke, 358 F.3d 429, 437 (6th Cir. 2004) (finding substantial abuse where debtor could pay a dividend of 14% to 23%)); In re Shaw, 310 B.R. 538, 542 (paying dividend of 29% over 36 months constituted significant portion of debtor's debts)); but see In re Stewart, 383 B.R. 429, 433 (Bankr. N.D. Ohio 2008) (finding no abuse where debtor could potentially pay 35% over 60 months). An ability to pay is not *per se* abuse. See, e.g., Green, 934 F.2d at 571-72. Instead, courts take a broader view, and there must be a showing of factors that tip the scale to warrant a finding of abuse under § 707(b)(3).

In this case, the bankruptcy administrator contends that the student loan obligation is an unsecured debt and that the $325 payment should, accordingly, be ratably distributed among all unsecured creditors. "The fundamental purpose[] of bankruptcy law in the United States is two-fold: 1) to ensure that an honest but financially distressed debtor receives a fresh start; and 2) to ensure that the debtor's claimants receive an equitable dividend from the debtor's bankruptcy estate, if such is available." In re Baker, 400 B.R. 594, 597 (Bankr. N.D. Ohio 2009) (citations omitted). Congress deemed certain unsecured debts to have priority status, pursuant to which those debts may be paid before the payment of debts held by other unsecured creditors. See 11 U.S.C. § 507. Student loans

14

are not listed as one of these types of priority claims, and the debtor acknowledges, on Schedule F, that his student loan debts are classified as unsecured nonpriority claims.

The court recognizes that the debtor's intentions in wanting to pay off his $60,000 debt of student loans in a timely and consistent manner are good ones. However, the Bankruptcy Code and policy do not permit such payment to the detriment of his other unsecured creditors. "Applying the principle of ratable distribution, the majority of courts has concluded that a debtor may not pay one unsecured creditor over other unsecured creditors." Baker, 400 B.R. at 599 (citing multiple supporting cases). A debtor who voluntarily pays one unsecured creditor, while paying other unsecured creditors nothing and seeking discharge with respect to the latter debts, is attempting to circumvent the distribution scheme set forth in § 726. Id.; see also In re Hammock, 436 B.R. 343, 358 (Bankr. E.D.N.C. 2010) (concluding that the debtor was "attempting to circumvent the Bankruptcy Code and free up funds to pay the non-dischargeable unsecured school debt, with interest, to the detriment of her other similarly situated unsecured creditors").

The court noted earlier in this order that the $505.16 amount previously paid for the debtor's wife's insurance is "known or virtually certain" to be available to debtor. Similarly, the $325 student loan monthly payment is also "known or virtually certain" and should be used in computing debtor's projected disposable income as funds available towards the payment of creditors. See Lanning, 130 S. Ct. at 2469-72. Accordingly, the court views the monthly $325 allocation for student loans as available funds that could and should be ratably distributed to all unsecured creditors.

In this case, debtor appears to be "living larger than reasonably necessary and has not attempted to reduce his expenses or lifestyle." In re Roppo, 442 B.R. 888, 896 (Bankr. N.D. Ill.

2010). With the funds available from just his student loan payment of $325 and the health insurance payment of $505.16, the projections provided by the bankruptcy administrator show that debtor could repay 40% of his unsecured debts over a 60-month payment plan, and closer to 50% if he applied some minor belt-tightening measures in his budget. As a single man with no dependents, no alimony payments, a steady job, and a paycheck that brings in double the average salary in North Carolina, it is well within the debtor's ability to make the changes suggested above and establish a meaningful distribution plan to pay back some of his creditors. His credit report is solid evidence of the fact that the debtor is, to his credit, able to stick to a payment plan and budget reasonably. It is unfortunate that events snowballed to create the currently difficult financial situation the debtor must navigate, but it is evident that this debtor is capable of creating, and following, a path out of these circumstances.

In sum, in evaluating the totality of the circumstances, the first and fifth of the Green factors lean in favor of the debtor's position. However, the remaining Green factors, as well as the "heavily-weighted" consideration of the debtor's ability to pay, together demonstrated that allowing this debtor relief under chapter 7 would be an abuse. The court will allow the debtor an opportunity to convert the case to one under chapter 13 within ten days of this order, or the case will be dismissed pursuant to § 707(b)(3).

**SO ORDERED**.

**END OF DOCUMENT**